James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: 973/994-1700

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AHMED CHAUDHRY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BLUE APRON HOLDINGS, INC., MATTHEW B. SALZBERG, BRADLEY J. DICKERSON, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, BRIAN P. KELLEY, BENJAMIN C. SINGER, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, CITIGROUP GLOBAL MARKETS INC. and BARCLAYS CAPITAL INC.,<br><br>Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT and<br>DEMAND FOR JURY TRIAL** |

Plaintiff Ahmed Chaudhry ("plaintiff"), alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Blue Apron Holdings, Inc. ("Blue Apron" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes

- 1 -

that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Blue Apron Class A common stock purchased in and/or traceable to the registration statement issued in connection with Blue Apron's June 29, 2017 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## PARTIES

2. Plaintiff Ahmed Chaudhry is a citizen of Texas residing in Dallas, Texas. Plaintiff purchased Blue Apron common stock, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

3. Defendant Blue Apron operates an e-commerce marketplace that delivers original recipes and fresh ingredients packaged as fresh meal-kits designed to be cooked at home by consumers. Two of Blue Apron's most significant distribution centers are located in this District in Jersey City and Linden, New Jersey. Blue Apron has two classes of voting common stock, Class A common stock and Class B common stock, and one class of non-voting stock, Class C capital stock. The rights of the holders of Class A common stock, Class B common stock, and Class C capital stock are identical, except for voting and conversion rights. Each share of Class A common stock is entitled to one vote, and each share of Class B common stock is entitled to ten votes. Shares of Class C capital stock have no voting rights, except as otherwise required by law. Only the Class A common stock was offered in the IPO, and following the IPO, Blue Apron Class A common stock traded on the New York Stock Exchange under the ticker symbol "APRN."

4. Defendant Matthew B. Salzberg ("Salzberg") is, and was at the time of the IPO, President, Chief Executive Officer and a director of Blue Apron.

5. Defendant Bradley J. Dickerson is, and was at the time of the IPO, Chief Financial Officer and Treasurer of Blue Apron.

6. Defendants Julie M.B. Bradley, Tracy Britt Cool, Kenneth A. Fox, Robert P. Goodman, Gary R. Hirshberg and Brian P. Kelley are, and were at the time of the IPO, directors of Blue Apron.

7. Defendant Benjamin C. Singer is, and was at the time of the IPO, the General Counsel and Secretary of Blue Apron.

8. The defendants named in ¶¶3-7 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement for the IPO (as defined below).

9. Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Citigroup Global Markets Inc. and Barclays Capital Inc. are investment banking firms that acted as underwriters of Blue Apron's IPO, helping to draft and disseminate the offering documents (the "Underwriter Defendants"). Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared $16.5 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Blue Apron stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Blue Apron, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Blue Apron that it would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Blue Apron had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Blue Apron and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Blue Apron, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Blue Apron's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Blue Apron's lawyers, management and top executives and engaged in "drafting sessions" between at least June 1, 2017 and June 29, 2017.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Blue Apron stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Blue Apron would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of these constant contacts and communications between the Underwriter Defendants' representatives and Blue Apron management and top executives, the Underwriter Defendants knew, or should have known, of Blue Apron's existing problems as detailed herein.

(e) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to plaintiff and the Class (as defined below).

10. Blue Apron, the Underwriter Defendants and the Individual Defendants are referred to herein as the "Defendants."

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o]. This Court has jurisdiction over this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

12. Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c). .

13. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## SUBSTANTIVE ALLEGATIONS

14. Defendant Blue Apron is an ingredient-and-recipe meal kit service. It operates exclusively in the United States. The weekly boxes shipped to customers contain ingredients and also include suggested recipes that must be cooked by hand by the customer using the pre-ordered ingredients. Blue Apron claims that one of things that makes it more profitable is its ability to apply its knowledge of what its customers want to eat to its purchase of food supplies to fulfill its food kits on a more cost-effective basis.

15. In August 2012, defendant Salzberg, along with non-parties Ilia Papas and Matt Wadiak, first began sending customers boxes containing the ingredients to cook multiple recipes –

packing and shipping the first 30 orders themselves from a commercial kitchen in Long Island City, New York. During 2014, the Company opened two fulfillment centers in Richmond, California, and Jersey City, New Jersey. After the opening of its third fulfillment center in Arlington, Texas in June 2015, the Company began shipping throughout the contiguous United States.

16. With more and more customers, including grocery customers, switching to online shopping, Blue Apron's sales increased exponentially over the next couple of years, increasing from $77 million in fiscal year 2014 ("FY14") to $340.8 million in FY15 and to $795.4 million in FY16. Blue Apron reported sales of $244.8 million during the first three months of FY17, purportedly putting it on track to report sales of nearly $980 million in FY17 – assuming sales continued growing at the same rate.

17. And Blue Apron was not alone. Online grocery and food product sales at Internet behemoth Amazon.com, Inc. ("Amazon") have grown, as have sales through online and brick and mortar retailers Walmart, Costco and Target. Indeed, those three alone had quickly accumulated a large share of the highly fragmented U.S. grocery market by December 2016, with Walmart – the largest U.S. grocer – at 17.3% of the market, Costco at 5.1%, and Target at 1.5%:



18. On or about June 1, 2017, Blue Apron filed with the SEC a Registration Statement on Form S-1, which would later be utilized for the IPO following several amendments made in response to comments received from the SEC.

19. On June 28, 2017, the SEC declared the Registration Statement effective and on or about June 29, 2017, Blue Apron and the Underwriter Defendants priced the IPO and filed the final Prospectus for the IPO, which forms part of the Registration Statement (collectively, the "Registration Statement").

20. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

21. The Registration Statement stated that Blue Apron's "innovative direct-to-consumer business model enable[d] [it] to . . . provide consumers with differentiated, specialty ingredients, many of which are not widely available and are exclusive to" Blue Apron. Elsewhere it listed as one of Blue Apron's "Strengths" the purported exclusivity of its product offerings, stating in pertinent part as follows:

> ***Superior products at compelling values***
>
> *. . . Because of the efficiencies in our value chain, we are able to provide our products at attractive price points.  We believe our ingredients are often fresher and of higher quality than those found in traditional and online grocery stores, and consumers also receive ingredients in the pre-portioned amounts necessary to cook our meals.  In addition, our recipes often feature specialty ingredients that are not readily found at many traditional grocery stores*.

22. The Registration Statement emphasized Blue Apron's "***Hard-to-replicate value chain***," stating in pertinent part as follows:

> We have made substantial investments in direct supplier relationships, talent, infrastructure, technology, and data to build an interconnected value chain.  We work

with over 300 different suppliers *and the majority of our food purchases are from suppliers who have entered into exclusivity arrangements with us*. These efforts enable us to deliver high-quality food at compelling values, utilizing ingredients that are often unique to us. We have built a diverse team and developed the processes to coordinate closely between such functions as professional chefs, technologists, and supply chain experts. Our value chain is supported by custom-built fulfillment and logistics operations to manage frequently changing, high-throughput, perishable inventory.

23. As to "Competition," the Registration Statement stated in pertinent part that Blue Apron was then "*the largest provider of fresh, pre-portioned ingredients and recipes in the United States*."

24. Concerning the Company's "Value Proposition" and the sustainability of its growing profitability, the Registration Statement stated that the "benefits of [Blue Apron's] innovative business model extend[ed] to multiple stakeholders," including its "stockholders," emphasizing that Blue Apron "benefit[ted] from high order frequency (4.1 Orders per Customer in Q1 2017) and high Average Order Value ($57.23 in Q1 2017), which, combined with anticipated declines in costs of goods sold as a percentage of net revenue and [its] efficient marketing payback," the Company then "*expect[ed] to result in attractive lifetime customer values*."

25. The Registration Statement further alluded to there being high costs of entry into the food kit industry, emphasizing Blue Apron's own "Marketing Efficiency" and its $94 customer acquisition expense, which it portended would be hard to replicate. The Registration Statement stated in pertinent part as follows:

> In managing our marketing expenses, we evaluate the efficiency of our marketing efforts in connection with our goal of maximizing customer lifetime value. We evaluate our marketing efficiency primarily from three perspectives: (1) our marketing spend per customer, or Cost per Customer, (2) our cumulative net revenue generated per Customer and (3) the associated cost of goods sold, excluding depreciation and amortization, as a percentage of net revenue, which we view as a key measure of our operational efficiency.
>
> To illustrate the efficiency of our marketing initiatives, we compared in the chart below the cumulative net revenue per Customer over specific time increments

- 8 -

from their first purchase with our cumulative Cost per Customer for the corresponding time period.

 

*(1)   Cost per Customer, or CPC, is calculated as cumulative marketing expenses for the years 2014, 2015, 2016 and the first quarter of 2017, divided by the total number of Customers acquired during such period. The Cumulative Net Revenue columns reflect cumulative net revenue per Customer from Customers acquired between 2014 and 2016. Each column reflects cumulative net revenue for the Customers in the applicable cohort divided by the total number of Customers in that cohort. The chart presents the average cumulative net revenue generated by all Customers included in the applicable cohorts, including from Customers that ordered only once and then ceased ordering as well as those Customers that continued to order from us and thus ordered multiple times. For a Customer to be included in the calculation for a particular column, the length of time that has elapsed since the Customer first purchased from us must be at least as long as the time period indicated for such column. Accordingly, the number of Customers included in the cumulative net revenue per Customer columns decreases as the time intervals increase. For example, the six-month column is calculated using the cumulative net revenue during the first six months following a Customer's first purchase from all Customers who first purchased from us between January 1, 2014 and September 30, 2016 (i.e., Customers who first purchased at least six months prior to the end of the first quarter of 2017). Customers acquired after September 30, 2016 are not included in any Cumulative Net Revenue column calculations because their first purchase occurred less than six months before the end of the first quarter of 2017.*

Using the same methodology as above, cumulative net revenue per Customer for the six months after such Customer's first Order was $402 for 2014 cohorts, $451 for 2015 cohorts and $387 for 2016 cohorts. ***We believe Cost per Customer accurately represents our average marketing spend per Customer for the periods presented***. Cumulative net revenue per Customer is driven by our ability to retain and engage Customers once we have acquired them, and therefore we believe cumulative net revenue per Customer accurately portrays Customer behavior relative to the costs incurred to acquire, engage and retain Customers.

We believe the above cohorted cumulative net revenue per Customer analysis illustrates our historical costs to acquire, retain and engage customers and the efficiency of our marketing expenses. The chart above also illustrates that, while we derive significant revenue from those Customers that continue to make purchases from us, over time our Customers on average order less frequently or sometimes cease ordering, as evidenced by the declining increases in cumulative net revenue per Customer over the time intervals presented. We further note that the above analysis does not reflect the variable costs of producing net revenue, including our cost of goods sold, excluding depreciation and amortization.

We further measure the efficiency of our marketing spend and the lifetime value of Customers by comparing the net contribution per Customer for an applicable cohort to our Cost per Customer. We calculate the net contribution per Customer for a particular cohort by subtracting the cost of goods sold, excluding depreciation and amortization, associated with Orders by such Customers occurring in a particular cohort from the net revenue associated with such Orders. To do so, we use the average cost of goods sold, excluding depreciation and amortization, for the period in which such Orders occurred. For Orders occurring in 2015 and 2016 and the first quarter of 2017, we use the average per Order cost of goods sold, excluding depreciation and amortization, for the applicable quarter in which such Order occurred, and for Orders occurring in 2014, we use the annual average per Order cost of goods sold, excluding depreciation and amortization. Using this methodology, our net contribution per Customer for the six month period after such Customer's first order was $115 for the period from the first quarter of 2014 to the first quarter of 2017, which is equal to 1.2 times our ***Cost per Customer of $94 for the corresponding period***.

26. The statements referenced above in ¶¶21-25 were inaccurate statements of material fact because they failed to disclose the following material facts that existed at the time of the IPO:

(a) the Company was experiencing delays at its new factory in Linden, New Jersey, which would force the Company to delay new product roll-outs;

(b) the Company had already decided to reduce advertising expenditures in the second quarter of 2017, which would depress sales in future quarters;

- 10 -

(c) the Company was aware of Amazon's efforts to enter the meal-delivery business and that Amazon was looking to acquire assets to help it in this regard; and

(d) the Company was experiencing issues delivering meals to customers on time and with of the all ingredients, which was hurting customer retention rates.

27. The IPO was successful for the Company and the Underwriter Defendants who sold 30 million shares of Blue Apron Class A common stock to the public at $10 per share, raising $300 million in gross proceeds for the Company ($283.5 million in net proceeds from the IPO after deducting underwriting discounts, commissions and offering costs).

28. At the time of the filing of this action, Blue Apron stock was trading at $5.31 per share, a ***47% decline from the IPO price***.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action as a class action on behalf of a class consisting of all purchasers of Blue Apron Class A common stock in and/or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Blue Apron or its transfer agent and may be notified of the pendency of

this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violation of §11 of the Securities Act
### Against All Defendants

35.	Plaintiff incorporates ¶¶1-34 by reference as if fully set forth herein.

36.	This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

37.	The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

38.	Defendants are strictly liable to plaintiff and the Class for the misstatements and omissions.

39.	None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

40.	By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

41.	Plaintiff acquired Blue Apron Class A common stock traceable to the IPO.

42.	Plaintiff and the Class have sustained damages.  The value of Blue Apron Class A common stock has declined substantially subsequent to and due to Defendants' violations.

43.	At the time of their purchases of Blue Apron Class A common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this

action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff commenced this action.

## COUNT II
### For Violation of §15 of the Securities Act
### Against Blue Apron and the Individual Defendants

44. Plaintiff incorporates ¶¶1-43 by reference as if fully set forth herein.

45. This Count is brought pursuant to §15 of the Securities Act against the Company and the Individual Defendants.

46. The Individual Defendants were control persons of Blue Apron by virtue of their positions as directors and/or senior officers of Blue Apron.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Blue Apron.  The Company controlled the Individual Defendants and all of Blue Apron's employees.

47. Blue Apron and the Individual Defendants were culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 21, 2017

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
JAMES E. CECCHI


/s/ James E. Cecchi
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973-994-1744 (fax)
JCecchi@carellabyrne.com

Samuel H. Rudman
Mary K. Blasy
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Corey D. Holzer
Marshall Dees
HOLZER & HOLZER, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

Attorneys for Plaintiff

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows **- List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| APRN | 6/29/2017 | 5000 | 10.25 |
|  | 6/29/2017 | 5000 | 10.25 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| APRN | 6/29/2017 | 5000 | 10.29 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

N/A

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __17__ day of __JULY__, 2017 in _____DALLAS_____, _____TEXAS_____.
                                                            City                      State

(Signature) X____*Ahmed Chaudhry*____
                DocuSigned by: 2DA17C4BE4FE477...

(Print Name)_____Ahmed Chaudhry_____